Case number 22-1096, XO Energy MA, LP and XO Energy LLC petitioners versus Federal Energy Regulatory Commission. Mr. Siegel for the petitioners, Mr. Glover for the respondent, Mr. Mays for the intervener. You may proceed. Good morning, your honors, and may it please the court. Peter Siegel for the petitioners. Lecturers are 3 minutes for rebuttal. The orders on review are arbitrary and capricious on both grounds of the briefing addresses. Starting with the remedy issue, there are 3 reasons for vacater here. First, at JA 251 to 253, the commission committed legal error in concluding that as a matter of law, it lacked discretion to award any remedy other than the one that would be appropriate for a 206 violation itself. What my clients are asking for isn't a remedy for a section 206 violation, it's a remedy for a filed rate violation. And if you look at page 47 of the commission's brief, they say, well, the reason we looked at section 206 and attempted to do the section 206 calculation is that this is a section 206 case with no unique or novel aspect. But the filed rate violation here is a quintessentially unique and novel aspect that broadened the commission's discretion to look beyond just the comparison of 2 rates and obviated the necessity to calculate what would have been charged under the pre-2017 rate. So, after finding that it couldn't calculate what would have been charged under the pre-2017 rate, which is a finding that we disagree with, and I'll explain why in a moment, the commission had certainly at least the entitlement and the discretion to, and in our view, the obligation to look beyond that and attempt to find another remedy. But it didn't look beyond that. It just said, okay, we can't do the section 206 violation, our hands are tied, this is a filed rate violation, and we can't remedy it. And that was erroneous as a matter of fact. Second, even assuming the commission could look only to the pre-2017 rate for the remedy, it acted arbitrarily and superficially in concluding that it couldn't calculate the amounts that could have been paid under the pre-2017 rate. There are three reasons for that. The first one is that the commission asked PJM, not the Independent Market Monitor, whether the software could have been updated. But under PJM's FERC-approved tariff, it's the responsibility of the Market Monitor, not of PJM, to make those calculations and maintain that software. But the fact that PJM couldn't do it is really beside the point, or the fact that PJM claims it couldn't do it is beside the point. The question is whether the Independent Market Monitor could have done it, and FERC didn't even ask. Before you even get to that, don't you have an issue about the rate being the default because of the timing issue? I'm sorry, you're being the default because of the timing issue? Yeah, like, in other words, the rate gets stated because the preliminary or interim rate, it ends up being the rate because it was not approved by FERC timely. So, we certainly, it's undisputed that there was an egregious file rate violation here, and that file rate violation arises because PJM, without any approval from the commission in advance, charges a rate that is below the default rate. And the commission won't dispute that when they stand up, and the IMM won't dispute that when they stand up. There was a file rate violation in this case. There was no entitlement for PJM to go ahead and charge the unapproved interim rate when it didn't have FERC's approval to go ahead and do so. Can you explain why Towns of Concord doesn't govern this? Like, they have discretion not to order a refund. And I'm trying to understand your argument that you're saying that they didn't understand they had discretion. Your Honor, the first argument we made in the brief was that Towns of Concord doesn't govern here, and we will readily agree with FERC that there is discretion to fashion a remedy in the context of a file rate violation. Including no remedy if they choose to do that. So, on some facts, the commission has discretion not to provide a remedy. That's what Towns of Concord stands for. Towns of Concord was the case that involved an accidental passed on overcharge of $30,000 over 15 years. And the end, the regulated entity essentially got a bill, passed it on to rate payers, and didn't, according to the case, didn't really even look at the bill. They just sort of passed it on and it turned out that at some point when they were passing those bills on, the components of the bill changed. Something was added that they weren't allowed to pass on. But similar to Towns of Concord, you could only prevail if they are required to give refunds. And I don't see that. No, Your Honor. Even if you assume that there's discretion not to provide a refund in general, our argument is that the bases that the commission invoked for declining to provide a refund here are arbitrary and concrete. And the first of those bases is the one that I've been discussing, which is that... So an abuse of discretion, they have discretion to decide what the refunds are and use their discretion? They acted arbitrarily and concretely in invoking improper grounds and irrational grounds for declining to provide a refund, and the first of those is the error of law that they looked only at the possible section 206 remedy calculation and didn't look at other possibilities, such as refunding all amounts paid. Well, they looked at that because that's what you proposed, right? But they chose something different. No, we did propose it, Your Honor, but what they said was the remedy has to be either the section 206 remedy or no remedy at all. And we can't calculate the section 206 remedy, so we can't provide anything. So they were at liberty to reject your calculation, but you're saying that they erred by not stating that they were doing so? Well, they provided no reason other than an apparent belief. If you look at JA 253, they say the appropriate remedial calculation has to measure the difference between the pre-2017 rate and the unapproved income rate. I'm paraphrasing from JA 253. Okay, I'm looking at it. Which paragraph are you? So that's paragraph 18. We continue to find that the appropriate refund calculation would have required a comparison of the proposed 2017 forfeiture rule with the pre-2017 FDR. But they said that's the appropriate refund calculation. Isn't that them saying that they think it would be appropriate that it must be done this way, which is different from we have no choice but to do it this way? They offer no reasoning other than, and if you look at page 47 of their brief, what they say is the reason for that is that this is an ordinary section 206 case with no unique ask. But it's undisputed this isn't an ordinary section 206 case. This is a section 206 case with a filed rate violation on top of it. As Judge Shouts was mentioning, under an ordinary section 206 case, what they would have done would have been to continue charging the pre-2017 rate until the new just and reasonable rate was approved. And then the commission would have looked at the difference between the new just and reasonable rate and the pre-2017 rate, and it would have had discretion. You know, there are a lot of D.C. Circuit cases about the discretion that it has in the context of section 206. Provide a refund. It cannot provide a refund. It has a lot of policies about when it does so and when it doesn't do so. But in this case, what FERC concluded was we can't do that calculation because essentially there was a filed rate violation. We don't know what would have been paid if PJM had followed the law and continued to charge the pre-2017 rate. That's a mystery. And the reason it's a mystery is because they violated the filed rate doctrine and didn't do what section 206 required them to do, which was to continue to charge that rate. So, my understanding your argument to be that they would have had discretion to say that the correct calculation is the one that finds the difference between the pre-2017 rate and the 2017 rate, et cetera. But because they did not state we're exercising our discretion to do that. And did not explicitly state and we're rejecting the refund everything approach that you proposed. That they aired, it's really a matter of. The way they phrased it is my understanding of what you're saying. No, I disagree with that. But you're saying that they would have had discretion to do that, but you're just saying they didn't exercise their discretion because of the way they phrased it in paragraph 18. They didn't ultimately do that, right? They would have had discretion to provide a remedy based on that. But what they found was we can't provide a remedy based on that 1st calculation. That's our option A. And we can't do it because we don't know what would have been charged. They're not saying we can't. They're saying the appropriate calculation. Is this this comparison of proposed 2017 with. They're saying that it's the appropriate way and since we can't do it, we're not going to. Provide a refund, but you're saying that because of the way they phrase this, because they use the word required, they didn't recognize they had discretion. Well, and they provide no reason to the extent you want to look at the phrase, the appropriate refund calculation. I think your point is, maybe they were exercising discretion because they say the appropriate refund calculation would have been this. The question is why it's utterly arbitrary that they determine that that's the only appropriate refund calculation. Under section 309 of the federal power act, they have broad remedial discretion to remedy violations of this. And, but, but again, they have discretion to reject your proposal and you're just saying they didn't explicitly say, and we reject. No, they didn't find any reason for determining that the appropriate refund calculation is this measure instead of a different measure. We propose other measures as well. And under a peer review, they can't simply say those don't work. They have to say why those don't work. Can I ask you a different question? Can you explain the leverage point? I'm having a little trouble understanding what that issue is, why the response was legally inadequate. Sure. So it goes to the 2021 rate and I do have other points that I'd like to return to as time permits on the remedial issue, but on the leverage issue. And on the 2021 rate, we have 2 points. We have the portfolio issue and the basic idea of the leverage issue. Is that if you don't stand to make more money. From supposed FDR manipulation. That you would lose in the process of engaging in virtual trades to manipulate the FDR. Why is that leverage? So, the idea of leverage, I'm thinking you're taking a debt to buy securities. Bothering me, the idea is you've got more weight on in order to make money for your FDR. You have to have more weight on your FDR position than on your virtual trade position. And if you have more on your virtual trade position, you're not going to sacrifice the virtual trade position to make money in the FDR position. It's the same concept as in a chess match. You might sacrifice a pawn to save your queen. You're not going to sacrifice a queen to save your pawn. And the idea is, in the context, and really the 1st thing I would say is. In the orders on review, if you can't parse what the leverage position is and why they rejected it, that's the reason for vacater and reversal. The commission is required to explain the justification for its action. And if sitting here today, we can't determine justification for its action. Then that's the ground for vacater. Of course. The leverage issue, as we pointed out in the brief. It is impossible to determine why they rejected it because they repeatedly conflated it with the portfolio argument, which is a different argument from the leverage argument. And it seems that they rejected the portfolio argument irrationally on the ground that they had already rejected the leverage argument. And then when we talk about the leverage argument, they just go back to the grounds on which they rejected the portfolio. Are you saying then that if there isn't leverage, then there isn't market manipulation because in order to. Of course, the whole purpose of manipulation is to make a profit from it. So, are you is this sort of by definition what the manipulation would be that the. That you've more weight in so that when you change your virtual portfolio. You're making a profit on the. I'm trying to understand because they say, is it necessary? And I'm trying to understand, like, is it necessary that for there to be leverage in order for there to be. So, short answer, yes, and I actually think if you'll indulge me, it's easier to explain through the portfolio concept, which is very similar. Okay, and I'll explain how they're slightly different, but they're the same general. They're related. So, the portfolio idea is that if you stand to make money on an. You know, a 5 dollar FDR say, going in 1 direction, right? But you have a. 100 dollar FDR going in the other direction and then your virtual trades. They would be promising and helpful for the 5 hour FDR going in the 1st direction. But they would lead you to lose money on the 100 dollar FDR going in the other direction and. I should make clear this is a gross oversimplification, but. The commission said, well, you might have an incentive still to manipulate for the benefit of that 5 hour FDR. So we don't even have to look at whether, in fact, it would be losing 100 dollars on some other FDR. Portfolio, and we said that doesn't make any sense. Nobody would engage in that in that conduct. As FDR manipulation, you might want to make virtual trades. It would have that effect, but you'd be making them for another reason. For instance, you think you're going to make a profit on the virtual trades. You're not doing it to manipulate FDR because you're going to lose 95 dollars. Yeah, and you know that in advance and so what the mission and the both said is, well, we don't want this to depend on whether you're going to make a profit. But our point isn't look at it from after the fact, and if you don't make a profit, then you get off scot free. It's that nobody would engage in the conduct as FDR manipulation in the 1st place because they know I'm going to lose money on my FDRs if I do that. So it's not FDR. Are there further questions? How does this thing leverage? And so the leverage concept, I apologize for not returning to leverage concept, but the basic idea of this portfolio concept is that the trades are going to cause you to lose more money on your FDRs than you would overall than you would gain on the single FDR that you supposedly manipulated, so you would never manipulate that FDR. The leverage concept is you're going to lose more money on these virtual trades than you would stand to gain on the FD on the supposed FDR manipulation. So you're not going to engage in that conduct because again, you know, in advance that if you don't stand to gain more from the FDRs, then you're going to lose with respect to your virtual position. You're just not going to do it. It's not profit. And you know in advance that it's not profitable, so you're not going to engage in supposed manipulation that's a money losing proposition from the outset. And there's been no, as you said, there's no response from FERP on the virtual position. So was your proposal that before there could be a forfeiture, they have to calculate the leverage basically to make sure that they would have profited from this? Yes, they have to take it out of leverage positions and in the portfolio argument that they have to look at the entire portfolio. They can't zero in just the FDR. At issue, they have to look at whether you would have stood to make money. That's the portfolio one. I'm talking about leverage. So were you, what was your proposal on what they should do about the leverage issue? I don't know that it got more granular than essentially take account of leverage. Look at whether a particular market participant actually stands to gain more from the FDR than they would lose in quote manipulating the FDR. And if they don't, then it can't be FDR manipulation. I see. So the idea that it would not, it's necessary to manipulation because they're not making money otherwise. So there would be no incentive to do this as a manipulation. Right, exactly. So your point would be that it is necessary, that leverage is a necessary component of manipulation in this context. Yes, exactly. And so when the commission said it is not necessary, that was arbitrary. Yeah, we disagree with that and I would love to disagree with their reasoning for that, except as we sit here, we have no idea what it was. What's your remedy for them not sufficiently explaining to remand for the explanation? So on the virtual issue, I think only a remand would be appropriate. The record just doesn't demonstrate what the commission's rationale was. On the portfolio issue, on the leverage issue, I think remand is appropriate. Remand without vacater? Oh, no, I'm sorry, Your Honor. Vacate and remand. We have no basis for concluding why they reached the decision they did. I think vacater is appropriate in those circumstances in addition to remand. Will it create confusion in the market if we vacate? If we could remand and say explain yourself better and not vacate, but would it create confusion in the market if we were to vacate? So, I want to address that. I would first say the remand without vacater approach is usually adopted when there's some reason to think that the agency would reach the same result on a remand. And again, here, we have nothing from the agency about why they reached the result. We need more explanation. Well, it's true that we need more explanation, but also there's no reason to think that if the commission were actually put to providing that explanation, it would reach the same result. Because in our view, as we've discussed, it doesn't make sense. And it's the same in the context of the portfolio issue, except that there, they've actually provided their rationale and it doesn't make sense. The rationale is essentially, you might do this because you'd like to have $5 in your left pocket, even if it's going to cost you $100 out of your right pocket. And that's, you know, they said, you'll manipulate one FDR, even if you're going to lose money overall, that doesn't make any sense. There's no reason to think that if they were required to come up with an explanation that did make sense, they would reach the same result. In our view, they couldn't possibly reach the same result. That's a vacator issue, and I think both of them are vacator and remand issues at really at worst in the context of the portfolio approach, I think it would be appropriate to reverse entirely. But didn't the commission explain the complexity involved in ordering refunds beyond the points you're making, and therefore didn't have to reach those points? I don't think so, your honor. Everything that they said was in the context of kind of bolstering their initial conclusion that they wouldn't provide refunds under the section 206 calculation. No, they said, look, they balanced and they addressed your issues on remand. And they didn't find after they modified their original order in some respects, that your arguments should prevail over the balance that the agency had thought should control here. Well, so your that's their bottom line conclusion, but it embeds the family of errors that we've. Discussed in the briefs, for instance, it rests on the conclusion that can't calculate the refund amounts because it's failed to maintain the software to do so, but failing to maintain the software is an independent filed rate. The question isn't whether can refund the amounts, but instead whether I'm sorry, I can perform the calculation, but instead, whether the, I am, which the tariff requires to be the 1 that performs the calculation can do it. Yes, but the issue is if the. The, the, the necessary data for the calculation, no longer exists. That's a different issue. Um, it's not that somebody else can recreate. So, you're I think that question goes to this idea, which is that said that, you know, even if we had properly maintained the software as. The file rate doctrine required us to do, you still couldn't provide a remedy here because nobody knows what market participants would have done. Yeah. Market participants change the markets change. I mean, we don't have a static situation here that a number of your arguments are premised on, and your recreation argument. Um, it seems to me the commission could probably say, um, you know, balancing what's at stake here. Um, we exercise our discretion not to order remedies. Well, those are magic words that they can say at the end of an irrational analysis. Yes, but do that conclusion of an analysis that is different than yours. In other words, they don't have to accept your approach willy nilly. They can explain why they're not going that way and come out with a conclusion that differs. Yes, I agree with that, but I would say that in every step of that analysis, they in fact made errors that made the bottom line. Well, you're saying that a file rate violation is different than the normal 206 violation. Well, why is it different I mean it's different in the sense in some instances, it's a more egregious violation. All right, as opposed to an, um, you know, an error in calculation. But that doesn't make the 206 proceeding in applicable, which seems to be the premise of your arguments here. Well, actually, Your Honor, in one very real sense, section 206 isn't applicable, which is that in the context of the section 206 replacement rate proceeding, the authority to provide a remedy arises under section 206, which very precisely sets out essentially a math problem that the commission can decide to do or not do subject to its discretion. It's not a math problem. That's the whole point, isn't it? That Congress understood these were difficult balancing situations, and it's not just adding up one column of figures versus adding up another column of figures. These are expert judgments, and Congress has delegated that expertise to these expert commissioners, not that it's a mathematical calculation that sort of anybody could do. Well, Your Honor, I agree with you in the context of section 309 and remedying a filed rate violation. In the context of section 206, it is a simple math problem. And the problem here is that what the commission did was it tried to do the section 206 math problem, found it was unable to do it precisely because PJM had committed a filed rate violation and made one of the variables for that math problem more difficult. That is not what the commission said. Your Honor, the principle basis for the commission's conclusion was the declaration of Brian Chmielewski from PJM, who said we don't upkeep the software. We haven't maintained the software to calculate what the charges would have been under the filed rate. And even if we had, you can't know what market participants would have done if we had adhered to the filed rate doctrine and charged the filed rate. There was market participants reliance on our violation of law. Obviously, I'm paraphrasing that. But that's the substance of what he said. We didn't follow the filed rate doctrine. We didn't charge the filed rate. And you can't know what anybody would have done if we had, but you can't provide a remedy. And the commission bought that reasoning without any recognition that that makes the filed rate doctrine, which according to the Supreme Court's decision in Maislin, is utterly central to regulatory regimes that require just and reasonable rates. The commission has reaffirmed that time and time again, but it doesn't necessarily mean that a violation of the filed rate doctrine obligates it to order refunds. And that's the point it seems to me you don't want to acknowledge in our cases, and indeed the Supreme Court acknowledged that discretion lies with the commission. I will readily acknowledge that discretion lies with the commission. You really don't. You're saying that 206 is mathematical. And that's the end of it, basically, and there's discretion, but it's very confined because this is a filed rate doctrine, and I understand your argument, and the commission could have adopted it, but it did not, and it explained in the language of our opinions, the path of the commission can be determined and reasonably understood. I think. As I stood here today, I've actually been arguing that it was the commission that viewed discretion as unduly constrained by section 206 when, in fact, the commission's remedial discretion was broader than just the. Section 206 remedy what the commission should have done was look to other possible remedies and recognition of the fact that the file rate doctrine. It is utterly central to this regulatory. And so, instead of just looking to the section 206 remedy and finding, well, the file rate violation makes it impossible for us to provide this 206 remedy. Ergo, we can't do anything. So, if I may, I'm looking at what the commission did right now. And I think it's important to note that the commission directed to include information on quote, the method by which would calculate refunds and surcharges. Based on the prior rate on file, but that was the task. That they assigned they wanted the refunds to be based on the prior rate on file, which is within their discretion to determine that that's the appropriate refund. And then it says XO Energy posits that PJM should refund all FTR forfeitures dating back January 19th, 2017. So, clearly they considered your proposal and their answer to that is they disagree. They want to do it based on the prior rate. They're entitled to do that. They have discretion. So, your honor, if they had said only that under the APA, that would be around for a catering remit. We don't want to do it. It's not a valid exercise of agency discretion. That is not what they said. I mean, with all due respect, you may disagree with its reasoning. But what Judge Pan just quoted from the rehearing order is not what the commission said. So, right and that was going to be the 2nd part of my answer. They, in fact, did not say only that what they said was in the context of just essentially what calculation. And we do, what are we empowered to look at as a possible remedy? Right? They said. In the context of rejecting our argument that they should just refund everything, but before your argument, they'd already decided they wanted it calculated based on the prior rate on file. That was the instruction in the prior order. So, and then they concluded that and then you said that you, why don't you just give us all the right? And they said, we disagree and they said it should be based on the prior rate on file. And then they said, that's the appropriate calculation. Right? Because they're entitled to do that. Because the pre 2017 rate was the effective rate on file in our view, and I recognize that's not what they chose to do. Right? Our view is that that response was a non set that response. If we're straightforward. Thank you. Thank you. Thank you. Thank you. Please the court I'm Matthew over and I represent the federal energy regulatory commission. I realize this is factually and legally complicated, so I want to start with a couple of points on the remedy that I think will clarify. 1st of all, I think my friend on the other side made an important concession that we do have discretion even in filed rate cases. That was clear from towns and concord was clear from a few of the other cases. We cited as well. The key span ravens with this court reversed us and said there was a file rate violation. Go back and decide if you want to remedy that in consolidated Edison in 2003. We cited both of these. You did the same. You reversed us. So there was a violation. We came back in 2007 and said, we've decided not to remedy that. You said we do balance yet. So that's an important concession because. They are tied to the arguments they made on re, hearing their principal argument on re, hearing was that we lacked discretion, but stepping back to stepping into how we exercise our own. And I just, I want to know 1 more case on the file rate recently in 2018 and unpublished decision in. I just want to know that we have a file rate violation that we found equitably there was no remedy. That's number 131138 at 739 Fed appendix 646. The court again was confronted with a file rate violation that we found equitably. There was no remedy. And among the factors that were considered, there was reliance was the time expense and difficulty with developing software. It was a different regional transmission organization called. They hadn't kept up their software. We said that was an issue. So I think that case was a lot of the same things, but there's a little bit confusion here on the remedy. My friend keeps saying we constrain ourselves to section 206. That's not true. Actually, the normal remedy in a, but if I can sit back and look at towns of Concord, it's more of what I would call classic file rate case where. You were charging a cost based rate. You weren't supposed to include the spent fuel cost, but you did. And so you were supposed to charge X, but actually you charge X plus 36000 dollars. The remedy in a file rate case is the remedy between what you charged and what the rate on file was. And that's why I think it was paragraph 16 at J. H. and 51 hearing where you went to. We were in those paragraphs are hitting there is the pre 2017 rate is the rate on file, right? They made arguments on appeal and below that. There was no forfeiture rate because that rate was found unlawful. That's where the 206 provision comes in 206. Structurally, when we declare at step 1, our rate is unjust and unreasonable. We have to go forward with that step 2 process. We cited era energy for discussing 2017 case for discussing why there's actually 2 cases from the circuit that more clearly state. 1 of them excited, but not for this proposition. It's the recent me. So transmission owners versus 45 at 4th to 48. we cited it for a different proposition, but at page 253 there, the court notes that after the step 1 provision quote, until sets a new break in a 2 or 6 proceeding customers continue to pay the challenge rate. So, that's why it remains the rate on file and you were supposed to continue paying. Now, if we were going to remedy, this is a 2 or 6 violation. My friend did point out that 2 or 6 has some provisions. 1 of them is there's a 15 month limit on on refunds. When you refund a 2 or 6 violation, what you do is you say you were charging an unlawful rate. You keep charging that unlawful rate and when we figure out what the lawful rate is, you refund the difference between the lawful rate and the unlawful. So, if the refund calculation for sort of a 2 or 6, if they kept charging the pre 2017 rate and never commit the file rate violation, we would still have discretion on whether we wanted to refund. We'd be limited in a number of months, but the refund calculation would actually be running the new rule that we approved in the compliance order. So, that's what we were trying to do. We looked at factors. We asked to provide us information and we consider what we think are appropriate factors. There are factors that this court in Ameren has looked at. I would note towns of Concord noted the difficulty and the time and expense involved in doing this. Could you address the leverage issue? Yeah, I'll take a quick break. So. I didn't really think about this way till I read their reply brief at 12 and then again at 14, they described both leverage and portfolio involving the intent to manipulate and needing to have the intent to manipulate. And so, if you look at the, the compliance order at paragraph 44, which is J. A. 2 or 4. We said there that we had previously rejected arguments about center or intent to manipulate in the 2017 order. No, 1 sought re, hearing of that. And so, as we were narrowing the proceeding, right? It starts with the 2014 proceeding where they're adding these up to congestion trends. And we narrow it in 2017 and said, you need to catch less hedging activity. You need to sort of narrow this rule. Here's what you need to do in that order. We rejected center or intent. And so, insofar as they're arguing, it's a necessary component of the final rule, because you can't capture intent or center without that, which I think is how they framed it in their reply brief. We rejected that in 2017 and in 2021, we said that that was an inappropriate collateral or inappropriate re, hearing that request or collateral attack of the earlier order. And I guess this goes to some of the market monitors points, but. On the sort of inappropriate re, hearing collateral attack again, I would cite to a very recent opinion of the court. It's another Louisiana Public Service Commission case. There's a lot of them, but this is the 2022 case number 20 dash 1315. it's unpublished. It's from last year. It's 2022 Westlaw 801353. Louisiana had a series of these cases about specific remedy. We had decided, I think it was in the year 2015 that they weren't going to get certain types of refunds. They didn't seek re, hearing of that. At the end of the case, they then sought to challenge those refunds. We said, that's a collateral attack on our earlier order. You needed to seek re, hearing. They responded, well, that earlier order wouldn't have been final, so we couldn't have gone to court of appeals. And this court said FERC was within its discretion to treat its proceedings that way. And it analogizes to your own law of the case. But even though Louisiana was claiming it wasn't final, and they couldn't have got to the DC circuit in 2015, our rule was you needed to challenge that on re, hearing and we later treated it as sorry, your honor. So, can I ask there? I know that you're framing this as the enter, but my understanding of their argument, and I'd appreciate your guidance on this. Beyond my depth a little bit. Their argument, I think, is that there's no manipulation unless there is leverage, because otherwise it's just a series of transactions that happens to have a certain effect. But unless they're profiting, that's not manipulation. So, that's part of the structure of this. This is an ex ante rule that is designed to catch when virtual transactions are having an impact that raises the value of your financial transmission rights being cross product manipulation. Again, parties argued throughout that you need to show a profit or you need to show sort of intent or other things. But I'm saying is profit different from it. Well, yes, to an extent, but one of the things and again, I don't mean to get too technical your honor, but you have to understand that these are paid out and they're based on different things. So, an FCR is going to be on a path from point A to point B. If there's congestion places along that path, you're going to get paid for those congestion charges. One of the things we criticized PJM about and asked them to revise from the original rule was these INCs and incremental bids and decremental, I'm forgetting the term, but the two initial types of virtual transactions where you virtually offer to buy or sell at one specific place. You're going to make money on that based on what the dollar value and sort of whether you're selling the day ahead and buying in the real time. If you sold for higher in the day ahead than you bought in the real time, you made money. One of the problems with the original rule, and it had this worst case scenarios thing, was you could make a bid very far away from your FTR or your financial right, and it would still increase. And this was a problem with the one cent test. It would still increase the FTR in some way. And so you'd forfeit. And we said that's too tangential. And so this idea of leverage or profiting, the problem is you don't know whether you're going to make money. You're speculating on what you think the price tomorrow versus today is at this one location, and that's going to have an effect on your FTR. But you don't know what your – over my time. Your profit is going to be based on what happens as to that location, not what happens everywhere along the path of the FTR. And so you're sort of bidding and speculating in two different markets. And what we're concerned with is these virtual transactions can create congestion. Congestion is then paid by the transmission rate payers. And that congestion, you shouldn't be benefiting when you created that congestion with your FTR because then you're using your virtual transactions and you are benefiting from it. Again, you might be making a really big bet on what the price is going to be like in Richmond tomorrow for power, but your FTR may run from D.C. to Baltimore. But that Richmond purchase, because they have to model this entire grid with where all of the power is moving, et cetera, that Richmond purchase is going to affect where they're modeling the grid and where the power is moving. So what is the difference between – so the premise of this is if you manipulate things in your virtual portfolio that affects the price of the FTR, you would only forfeit if you're profiting on the FTR. So what's the difference between leverage and just a violation where you're profiting on the FTR? So I think that there's two points. One is the manipulation is that your virtual transactions, which is one market you can profit or lose in those, are benefiting your other set of transactions. And if I can give an example for where the rule is technically under-inclusive and how we don't go after intent. If you have a situation where you engage in a bunch of virtual transactions to raise the value of your FTR, you are meeting to cross-product manipulate. And you raise the value of your FTR because you created congestion between D.C. and Baltimore. Again, I'm simplifying like there's only two transactions or something. And so congestion ended up being $100. Your FTR's value is going to be $100. You've got $100 for congestion. Again, it's the day ahead market for tomorrow. Overnight, an act of God knocks out the main transmission line there such that there's massive real-time congestion between D.C. and Baltimore. There's a whole other case about this. PJM has a $2,000 limit, so the congestion price can't go above that. But it causes the congestion price to go to $2,000. You don't have to forfeit your FTR profits because the last provision of the forfeiture rule is you only forfeit when the day ahead market had greater convergence or greater congestion than the real-time market. And that's because the idea of virtual trading is that it will provide not just liquidity but efficiency and that the day ahead market will look more like the real-time market because of virtual trading. And so in that case, you intended to manipulate. You did manipulate. You got money off of your FTR. But because there was market convergence, you didn't get penalized. Now, I believe it was Exxon or someone earlier on in the 2017 proceeding – there's a lot of orders and a lot of descriptions – argued that, well, wait, sometimes you can increase convergence and you're still manipulating. And it was one of the reasons we added the rule to what are called counterflow FTRs. Again, I apologize for getting really technical. But we said we're still only going to make you forfeit your profit when the end result was greater congestion in the day ahead than in the real-time market. Again, because the virtual transactions that created that congestion in the day ahead market, someone's paying that congestion. Like, that's actually impacting the system. And that's where when we talk about portfolios, we're worried about your full portfolio of virtual transactions because we're worried about how you actually caused or didn't cause congestion. Sorry, I know I went very – But so then if you're a virtual portfolio, you lose money on it and you gain money on your FTR. Why isn't that an appropriate comparison to make, which I take it is the leverage point? Again, the point being we don't want virtual – because people know that you're buying these at different times. You know that you have an FTR here. We don't want you engaging in virtual transactions. For example, speculating really wildly that, gee, we really think the price enrichment is going to go wild and we'll make a lot of money. But if we don't, we have this backup DC to Baltimore FTR that will also be helped by this. So in the event, if we speculate correctly, the FTR doesn't make us money, but we make a bunch of money in the virtual transactions. But if we speculate incorrectly, the FTR is going to make us money. You've still engaged in a virtual transaction that is going to raise the value of your FTR and that's going to cause congestion. So we weren't looking at, gee, should you be kind of speculating wildly. It's are you engaging in – and again, if we're only up to congestion transactions, which is the type we added, it would be a little easier to see because those have a start and end point. And so it's a little easier to see where those are going to have an impact. But because virtual bids can be at a location that impacts your FTR path, but it's not the entirety of your FTR path, or it could be where the constraint is somewhere else on that path, the constraint being the congestion, it may not be the whole path, it may just be a limited piece of the path. We didn't think for an ex-ante rule, right, we wanted an ex-ante rule. Some regional transmission organizations kind of, after the fact, police this. But we found it acceptable for PJM in 2001 and since to have an ex-ante rule that tells you when your virtual transactions will be considered cross-product manipulation because they are impacting the value of your FTRs. You're only going to forfeit when you profit because we don't think you should forfeit when you didn't profit on the FTR. And again, that's a lot of narrowing. And if I can make one point about hedging, FTRs were designed as a hedge for load-serving entities like, I think, Exelon or Constellation in Maryland or Dominion in Virginia that serve customers, right? They have to purchase what's called firm transmission because they don't want to be curtailed when they're buying power. And so when they purchase this firm transmission, they're given these things, option of revenue, right? The idea being that if you're a Virginia customer like I am and there's congestion getting the power to Virginia, Dominion isn't going to keep changing the price on me and charging me for that. They're going to hold an FTR that will allow them to get that congestion money back. So the FTRs are designed for those entities to hedge, and that's the kind of legitimate hedging that we're concerned with. But with respect to the leveraging in the 2017 order, there was a statement about leveraging may play a part in the cross-product manipulation, but it's not a necessary condition. So where do you take that position now? So I think, sorry, I didn't mean to talk. Yeah, your position. That goes to the structural point that this is an ex-ante rule, right? And so in my example, you know, you leveraging that you're planning to make a lot of money on this, you know, making small bets in the virtual transactions or making specific bets that you're, again, like it may play a part that you have, you know, used your virtual transactions to make money. We didn't think that when we're establishing an ex-ante rule that will just let you know when you engage in this conduct, you will forfeit. We didn't think it was necessary to consider that. We thought you could have a just and reasonable bright line. What can a non-leveraged transaction be manipulated? Again, I think the problem is that you don't, the way the FTR is paying is different than the way that the individual virtual transaction is paying. And so you could be making a very large virtual transaction, expecting the price to be exactly the same today and tomorrow so that it'll net you nothing. But you want it to raise the value of your FTR. You know, if you want your FTR to go up $100, you bet $1,000 over here. But your intent was to win on the FTR because you think that 1,000 here is not, you think there's going to be no congestion, no nothing. So you're betting that, assuming that tomorrow the price will be the same, right? You were intending to manipulate your FTR. You've made this bet with the intent to manipulate your FTR. But it turns out that in the virtual market, something happened that caused your bet to be a losing one. And so you made $100 on the FTR like you intended to. Actually, rather than paying, selling for 1,000 today and buying for 1,000 tomorrow, something happened in that location such that the price, you know, was different and you lost money. You intended to make money on your FTR by betting on your virtual transaction, but you didn't. And again, that's because the FTR can make money. The FTR can make money from the entirety of its path, like congestion on different points along its path. The virtual, in terms of the increment and decrement, is a specific location. And that's one of the actual narrowing provisions in the final rule is that we didn't want to look at the entire FTR path. We wanted to look at where your virtual transaction caused, like, which constraint. There could be multiple congestion points on an FTR path. And if the one that led to their increasing value was not the one your virtual transaction had any impact on, you don't need to forfeit. Under the old rule, you actually would have forfeited. I think Judge Rogers might have had a question. Oh, sorry, Judge Rogers. No, no. I thought the explanation was helpful. I know I'm well over. If I could cite a couple of quotes. I just want to note, I think that your opposing counsel made the point that if we can't understand what you did, then we should vacate because you haven't explained it adequately and haven't addressed it meaningfully. And through all this argument, I'm sort of starting to understand, but it seems that as an initial matter, like, you are obligated to address their concerns meaningfully. And if we're having so much trouble understanding what you did, why isn't this a remand so that you can explain it? So, I think part of that goes to, again, the structure of this proceeding. Things like the intent point early on in the proceeding in the 2017 order, we addressed a lot of these arguments. And in the 2021 order, we addressed some more. And, you know, by the time we got to the 2022 or the compliance order, right, we were directing them to make specific changes. And this is actually exactly what I was going to point to. In the 2021 order at paragraph 70, which is JA113, we rejected a leverage argument from another party. I'm not going to try to pronounce their name because it's long and complicated. Noting that, you know, we don't require PGM to exempt from forfeiture an effective FTR holder's positions where its virtual transaction position exposure is greater than its FTR exposure. We're not persuaded that these proposals are, at this time, necessary elements of a just and reasonable replacement rate. So, we had earlier on said these are not necessary for a just and reasonable rate. The ultimate question we're trying to answer, and I think when you challenge our rate, you know, again, I understand, Judge Payne, you're making kind of an APA failure to explain challenge compared to an unjust and unreasonable rate challenge. But we had earlier on said, you know, we don't think that's necessary for an ex ante rule that is going to, you know, try to catch cross-product manipulation. We just didn't think those were necessary provisions. We said it then. They came back and kept saying you can't be just and reasonable without these. And we, again, reiterated that. And as to kind of the explanation, my friend hit today that he hit in his reply brief and in his opening brief that in the rehearing order, we, you know, discussed portfolio leverage and portfolio FTR arguments together. If you look at the rehearing order, and I apologize, we didn't include the whole thing in the JA, but it's available. It's in the record. In their second and third statements of error, which we include statements of error, it's their Sumerian arguments. If you look at the rehearing order, they switched between leverage and portfolio in the same paragraph, paragraph after paragraph. I think it's pages, I want to say 10 to 13 of the rehearing order. But anyways, the point is they were addressing them both together in those challenges. We addressed them both in that paragraph, but there are earlier paragraphs addressing these various points. But it seems that every time you address it, you say the same thing. We acknowledge that leverage may play a part in a cross product manipulation, but it is not a necessary condition. And if that's not clear, it's not clear in every single order in which you've said that. Yeah, I guess, you know, I don't have a number of like, I gave the 2021 order citation the next paragraph. I'm looking at that. We rejected profitability. You know, I think I would have to go back and look at those and see what were we citing arguments the market monitor made, et cetera. But, you know, our ultimate question in 2017 was, is this just unreasonable? And we were looking at a few factors in 2021. We narrowed that saying, I think a just and reasonable rate needs to have certain provisions, but doesn't need to have these others. And so, you know, we didn't think catching center, we didn't think catching kind of the profitability between the two markets were necessary to an ultimately just and reasonable. I think it boils down to whether this sentence meaningfully addresses it. That it may play a part, but it's not a necessary condition. And that's what I went to. Exactly. And if that's not clear, then you haven't addressed it. Could you say the question is where the commission has referred to its previous decisions? Isn't that the corporation by reference? That has acknowledged. It's too late to seek re, hearing. Of the 2017 and 2021. Yeah, we can discuss that later. If you have one of their site, my notes, that's just in the 2017 order paragraph 80. Which I know is 38, we have rejected another parties. I think it was. I don't know what the acronym stands for, but argument for leverage and the footnote there. Anyway, so the 2017 does have some discussion of this. I appreciate your question again. That sense specifically, I think, is capturing the idea. If you don't think that we explained early on, that's all. But the idea that adjusted reasonable rate doesn't need this component. It's an ex ante sort of forward looking point. If the quarter has no questions, I realize I'm very far over. I appreciate your time. Thank you. Thank you. Thank you. Please. Yes. My name is Jeff maze. I'm counsel for the independent monitor for. The core flaw and X energy's case is that has appealed the wrong words. The 2022 order and the 2022 hearing. 2022 orders on appeal address single component of the. The impact test, the impact test is the only issue within the scope of the 2022 order. Yet does not appeal the impact test. Instead, the appeal addresses findings on other issues address and the 2021 order that is not on appeal. And in the 2017, or XO does not support its claim that an appeal 2022 orders. So, energy sites cases that are not about work. And RTO market rules, none of them are on point. The 2021 order is not abstract. It defines the scope of compliance directed. XO energy's arguments are all directed at the 2021 order. And the council earlier noted a decision. In the unpublished and we would say on a public service commission versus. Where the, the score found. That the appeal in earlier for. Was not on. So, at this time, I'd like to make myself a bit of questions. What do you sorry? Go ahead. Please proceed. Okay, 2 questions. 1 is just your position on the remedy issue. And then also with respect to whether there's a violation about rate. We didn't take a position on the remedy issue. Our concern here really is to protect the rule. We think that is a very important role for the efficiency of the markets and protecting against manipulation. We think such a rule always needs to be in effect as long as we have virtual trading in the markets. Having that rule is necessary in order to have virtual trading in the markets. And arguably even to have a crusade stay ahead of real time market construct that we have. Let me ask you, I read your brief. I didn't see that. Adopted that position of forfeiture. Am I incorrect? Not that state a forfeiture. Rule that this court has long recognized that final rules cannot be collateral attack. After the time for petitioning for review has expired. But I did pick up on that argument at any point and I didn't hear it this morning either. Yes, in the 2017 order. On these issues, the issues in this case. We're raised by X energy and perhaps we're also raised by others. And a decision was made the final decision that those elements, those components are not necessary for adjusting reasonable. Right. But why would you not have picked up on this argument? That's I just wasn't clear about that because your brief was so definitive on this matter. Right. I don't know why as far as we did, but I would point to the 2017 order and the 2021 order. And the 1st compliance round basically states in its order that the arguments being raised by X. So, here that they're not probably part of the compliance proceeding. And so I think that is, you know, it's not in the current briefing stage. But in that 2021, I think is saying essentially the same thing that we're arguing. Thank you. Thank you. Anything further now. Okay. Thank you. I'd like to begin by taking a crack at the question that judge Rogers just asked. I think the answer as to why the commission didn't adopt the argument is that this is not a lateral attack. The rule was approved only in the order that is now on review. There were aspects of the rule that were passed of other proposals. I should say that were passed upon in earlier orders. But we had no obligation and the commission did not say in this brief that we had any obligation to seek rehearing those orders in order to preserve our arguments. As to the final rule, which is now properly on reviewing. Would you agree, though, that this court, given that FERC has referred to these actions it took previously in 2017 and 2021, that this court has traditionally looked for the explanation provided by the agency and a reference is sufficient? In other words, when the agency has decided 1, 2, 3, it doesn't in the fourth situation also have to re-decide 1, 2, 3. It can simply refer to the orders on 1, 2, 3. And to the extent that the court is concerned about an accurate explanation, the court looks to the orders 1, 2, 3. Yes, Your Honor, I don't take objection to that principle at all. The issue here is that if you look back, what you're essentially getting is 0 plus 0 plus 0 plus 0 equals 0. No, I understand that it's your position, but that is not the agency's view of what it previously said. So your position in challenging the current order is that the court essentially is obligated to look at what authorities, the agency cited, including its prior decisions that address issues you have raised in this appeal. Yes, I completely agree with that, Your Honor. On the portfolio issue, if you scour the record and look at all the orders, including the ones that are on review and the ones that were previously issued, you will find a rationale that's essentially market participants will have an incentive to manipulate a smaller FTR for the benefit of a smaller FTR, even if it's going to cause them to lose money on their overall portfolio. As we explained in the brief, that doesn't make any sense. If you look back at all the orders, what you'll be left with on the leverage issue is a few orders that seem to conflate the leverage in the portfolio issue. And then I believe two orders, possibly three orders, that repeat the sentence about leverage being a factor but not entirely determinative. Isn't it correct, though, that you presented those two arguments basically together and not in these separate ways that you are explaining them and they are meeting regarding these terms in response to Judge Pan's questions? I wouldn't concede that, Your Honor. I think we presented them as independent arguments, and I think they're inherently independent arguments. They cover a different subject matter. As I acknowledged earlier, they're certainly related concepts, but they're independent arguments. Well, I understand that it's a different argument to say that something is blue and something is inequitable. But on the other hand, if you say not only is this order arbitrary and capricious for a number of reasons, it's also arbitrary because it's blue and the other factor. That's all I'm getting at. In other words, it's not as though you try and disappeal to get the kind of decision from FERC to just repeat. You disagreed with it. But as FERC said on rehearing, here are the arguments you presented on rehearing, and that's what we're addressing. I think if you look at FERC's brief in this court, their contention is in these were all jumbled together. We didn't understand them. And so we gave a jumbled together response, and you should affirm because the arguments were presented in a way that was jumbled together. Their response is on the portfolio issue, you would have an incentive to manipulate regardless of your portfolio. As we covered, that doesn't make any sense. On the virtual issue, they offer a rationale for their decision on the virtual, excuse me, on the leverage issue. That again, what we hear today is an extreme elaboration on anything that we saw in the briefs or in the orders on review. The orders on review don't have a thorough explanation of their reasoning, don't provide any basis on which to conclude that their reasoning was either rational or irrational. They just state a conclusion, essentially, and that's not enough under Chenery. And to the question that Judge Pan asked earlier on, and Judge Shouts asked as well on should the court remand or vacate and remand, our position is on the portfolio issue. There's really no way that on remand the agency is going to find the same way if they're forced to provide a rational explanation. And sort of basic APA Chenery principle is that we don't just assume that the agency would reach the same result. If they provided reasoning that is irrational, there has to be some kind of showing before the court takes the step of remanding without vacater, which would leave in place a rule that has no justification for it subject to the future actions of the agency. And I don't think it's a safe assumption in this case that if this were remanded to the agency, they would in fact come up with a rational rationale for the rule that they've adopted. Well, that must be premised on your proposition that the agency was required to adopt your analysis. And the agency, specifically on rehearing, said it disagreed. And so to explain why it disagrees, we can look at what it said about this very issue. That's all I'm getting at. You can look at what the agency said about the issue in the orders on review and the prior orders. But to the extent those don't provide a reliable indication that the agency. I understand that. Yeah. Okay. Thank you. Thank you.
judges: Childs, Pan, Rogers